M. S. BEASLEY, *Plaintiff in Error,* v. W. B. CAHOON, as Sheriff of Duval County, Florida, *Defendant in Error.*

147 So. 288.

Opinion filed March 16, 1933.

Re-hearing denied April 1, 1933

*John E. Mathews, Lacy Mahon, Moe Safer, George C. Bedell* and *Chester Bedell*, for Plaintiff in Error.

*Cary D. Landis, Attorney General,* and *Albion W Knight,* for Defendant in Error;

*David J. Gallert* (N. Y. City) and *John S. Bradway,* (Durham, N. C.) as *amici curiae.*

## STATEMENT

WHITFIELD, J.—The indictments herein severally allege as follows:

*"In the Name of and by Authority of the State of Florida:*

"The Grand Jurors of the State of Florida, empaneled and sworn to inquire and true presentment make in and for the body of the County of Duval, upon their oath do present that M. S. Beasley and A. H. Cooledge, whose full names are to the Grand Jurors unknown, late of the County of Duval and of the State of Florida, on the third day of January in the year of our Lord, One Thousand Nine Hundred and Thirty-two, in the County and State aforesaid, being then and there engaged in the business of making loans of money in the amount or to the value of $300.00 or less, without first obtaining a license from the Comptroller of the State of Florida and entering into bond as required by law, and as such lender of money, did then and there loan to one Edward Clance a sum of money, to-wit, the sum of thirty-five dollars and did charge and receive thereon interest at a rate exceeding ten per cent. per annum; contrary to

the form of the statute in such cases made and provided and against the peace and dignity of the State of Florida."

In habeas corpus brought by M. S. Beasley before a Circuit Judge, the following final judgment was rendered:

"This cause coming on to' be heard upon the petition of M. S. Beasley, averring his illegal detention by the Sheriff of Duval County, and praying for the issuance of a writ of habeas corpus and discharge upon final hearing by this Court, upon the writ issued pursuant to said petition, and the return of said Sheriff to said writ, the petitioner being present in proper person and by counsel, the State of Florida being represented by the Assistant State Attorney and the Assistant County Solicitors, and the Court having heard the argument of counsel, and it appearing to the Court that said Sheriff is holding said petitioner in custody by virtue of a certain capias issued out of this court, based upon the several indictments alleged in said petition, that said indictments are, severally, for alleged violations of Chapter 10177, Laws of Florida, 1925, that the sole contention of petitioner is that said Act of the Legislature is unconstitutional and void upon the grounds set forth in said petition, that careful examination by the Court of said grounds, shows their insufficiency, that said Act of the Legislature is not in conflict with, nor does it violate the Constitution of the United States or the Constitution of the State of Florida, and that said petitioner is lawfully in custody, it is thereupon ordered and adjudged that the said petitioner, M. S. Beasley, be, and he is, hereby, remanded to the custody of the Sheriff of Duval County, there to remain until he is legally discharged from such custody.

"It is further ordered and adjudged that the costs herein assessed by the Clerk in' the sum of four and 70/100 dollars be paid by the petitioner, M. S. Beasley.

"Done and Ordered, at Chambers, Jacksonville, Florida, this 26th day of September, A. D. 1932.

"George Couper Gibbs, Judge."

"All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety." Sec. 1, Dec. Rts., Fla. Constitution.

"No person shall be subject to be twice put in jeopardy for the same offense, nor compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken without just compensation." Sec. 12, Declaration of Rights, Florida Constitution.

"The Legislature shall not pass special or local laws in any of the following enumerated cases: that is to say, regulating the jurisdiction and duties of any class of officers, except municipal officers, or for the punishment of crime or misdemeanor," etc. Sec. 20, Art. III, Fla. Constitution.

"In all cases enumerated in the preceding section all laws shall be general and of uniform operation throughout the State," etc. Sec. 21, Art. III, Fla. Constitution.

Chapter 101777, Acts of 1925, is as follows:

"An Act to License and Regulate the Business of Making Loans in Certain Counties in Sums of Three Hundred ($300) Dollars or Less, Secured or Unsecured, at a Greater Rate of Interest Than Ten Per Centum Per Annum; Prescribing the Rate of Interest and Charge Therefor, and Penalties for the Violation Thereof, and Regulating the Assignment of Wages or Salaries, Earned or to be Earned When Given as Security for Any Such Loan.

"Preamble

"Whereas, there is and has long been conducted in this State, an extensive business of making small loans to per-

sons in need of funds to meet immediate necessities, of little financial responsibility and unable to furnish indorsements or securities acceptable to banks and financial institutions; and

"WHEREAS, the conduct of such loan business has long been a cause of general complaint and of much hardship and injustice to poor borrowers, and there is no existing legal regulation of the business of making small loans that has proved effective for the protection of such borrowers and for the punishment of usurious money-lenders, and the suppression of extortionate practices; and

"WHEREAS, it is recognized that the business of lending small sums of money, repayable in weekly or monthly installments, unsecured or upon unsubstantial security, does exist and will persist through public necessity for such loan service and that there exists a legitimate need for a law which will enable such loans to be obtained and the lenders to be licensed and supervised under proper restrictions and regulations; and

"WHEREAS, it is desired to suppress the 'Loan Shark' evil, by authorizing and regulating the conduct of the business of making small loans, upon fair and lawful terms, thereby inducing reputable money-lenders to obtain State licenses,

"THEREFORE, this remedial Act in exercise of the police power of the State to promote the public welfare by giving relief to needy borrowers and by regulating the business of making loans of the classification defined, which demands appropriate legislation, based upon a necessity springing from distinct differences from other classes of money-lenders and loans.

*"Be It Enacted by the Legislature of the State of Florida:*

"Section 1. That no person, co-partnership or corporation shall engage in the business of making loans of money, credit, goods or things in action in the amount, or to the

value of Three Hundred ($300.00) Dollars or less, and charge, contract for, or receive a greater rate of interest than ten per centum per annum therefor, except as authorized by this Act, and without first obtaining a license from the Comptroller of the State of Florida, hereinafter called the licensing official.

"Sec. 2. Application for such license shall be in writing and shall contain the full name and address, both of the residence and place of business of the applicant; and if the applicant is a co-partnership, of every member thereof; or if a corporation, of each officer thereof; also the county and municipality, with street and number, if any, where the business is to be conducted. Every such applicant at the time of making such application shall pay to the licensing official the sum of One Hundred ($100.00) Dollars, as an annual license fee and in full payment of all expenses for examinations under, and for administration of this Act; provided that if the license is issued for a period of less than twelve months the license fee shall be pro-rated according to the number of months that said license shall run.

"(a) All license fees herein provided for shall be collected by the licensing official and shall be turned into the State Treasury. The licensing official shall have full power to employ such examiners or clerks to assist the licensing official as may from time to time be deemed necessary and fix their compensation, and all salaries and expenses necessarily incurred in the Administration of this Act shall be paid out of license fees collected and turned into the State Treasury under the provisions of this Act, upon the presentation of itemized vouchers, duly verified, and having the approval of said licensing official. The licensing official shall issue his warrant on the State Treasurer for such salaries and expenses, and the State Treasurer shall pay the same

out of said fees, and for that purpose the said fees are hereby appropriated for use during each fiscal year.

"Sec. 3.  The applicant shall also, at the same time, file with the licensing official a bond in which the applicant shall be the obligor, in the sum of One Thousand ($1,000.00) Dollars, with one or more sureties, whose liability as such sureties shall not exceed the sum of One Thousand ($1,-000.00) Dollars in the aggregate, to be approved by the licensing official, and said bond shall run to the State of Florida for the use of the State and of any person or persons who may have a cause of action against the obligor of said bond under the provisions of this Act.  Such bond shall be conditioned that said obligor will conform to and abide by each and every provision of this Act and will pay to the State and to any such person or persons, any and all moneys that may become due or owing to the State and to such person or persons, from said obligor under and by virtue of the provisions of this Act.

"Sec. 4.  Upon the filing of such application and the approval of said bond and the payment of said fee, the licensing official shall issue a license to the applicant to make loans in accordance with the provisions of this Act for a period which shall expire the first day of March next following the date of its issuance.  Such license shall not be assignable.

"Sec. 5.  If in the opinion of the licensing official the bond shall at any time appear to be insecure or exhausted or otherwise doubtful, an additional bond in the sum of not more than One Thousand ($1,000.00) Dollars satisfactory to the licensing official shall be filed within ten (10) days after notice to the licensee; and upon failure of the obligor to file such additional bond the license shall be revoked by the licensing official.

"Sec. 6.  The licensing official may, upon notice to the

licensee and reasonable opportunity to be heard, revoke such license if the licensee has violated any provision of this Act; and in case the licensee shall be convicted by a Court a second time of a violation of Section Thirteen (13) of this Act, the licensing official shall revoke such license, provided that the second offense shall have occurred after a prior conviction; and thereafter no license shall be issued to such licensee; nor to the husband or wife of the licensee; nor to any co-partnership or corporation of which he is a member or officer.

"Sec. 7. The license shall be kept conspicuously posted in the place of business of the licensee.

"Sec. 8. No person, co-partnership or corporation so licensed shall make any loan provided for by this Act, under any other name or at any other place of business than that named in the license. Not more than one place of business shall be maintained under the same license, but the licensing official shall issue more than one license to the same licensee upon the payment of an additional license fee and the filing of an additional bond for each license.

"Sec. 9. Whenever the licensee shall change his place of business he shall at once give written notice thereof to the licensing official, who shall attach to the license his approval in writing of the change.

"Sec. 10. The licensing official, for the purpose of discovering violations of this Act, may either personally or by any person designated by him, at any time and as often as he may desire, investigate the loans and business of every licensee and of every person, co-partnership and corporation by whom or by which any such loan shall be made, whether such person, co-partnership or corporation shall act or claim to act as principal, agent or broker, or under or without the authority of this Act; and for that purpose he shall have free access to the office or place of business, books, papers,

records, safes and vaults of all such persons, co-partnerships and corporations; he shall also have authority to examine under oath all persons whomsoever whose testimony he may require relative to such loans or business.

Sec. 11. The licensee shall keep such books and records in his place of business as in the opinion of the licensing official will enable the licensing official to determine whether the provisions of this Act are being observed. Every licensee shall preserve the records of final entry used in such business, including cards used in the card system, if any, for a period of at least two years after the making of any loan recorded therein.

"Sec. 12. No licensee or other person, co-partnership or corporation shall print, publish or distribute or cause to be printed, published or distributed in any manner whatsoever any written or printed statement with regard to the rates, terms or conditions for the lending of money, credit, goods or things in action in amounts of Three Hundred Dollars or Less, which is false or calculated to deceive.

"Sec. 13. Every person, co-partnership and corporation licensed hereunder may loan any sum of money not exceeding in amount the sum of Three Hundred ($300.00) Dollars and may charge, contract for and receive thereon interest, at a rate not to exceed three and one-half (3½) per centum per month. Interest shall not be payable in advance or compounded and shall be computed on unpaid balances. In addition to the interest herein provided for, no further or other charges or amount whatsoever for any examination, service brokerage, commission or other thing or otherwise shall be directly or indirectly charged, contracted for or received, except the lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for filing or recording or releasing in any public office, any instrument securing the loan, which fees may be collected when the loan

is made or at any time thereafter. If interest or charges in excess of those permitted by this Act shall be charged, contracted for or received, the contract or loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever.

"(a) No licensee shall directly or indirectly charge, contract for or receive any interest or consideration greater than ten per centum (10 per cent.) per annum, upon the loan, use or forbearance of money, goods, or things in action, or upon the loan, use or sale of credit of the amount or value of more than Three Hundred ($300.00) Dollars. The foregoing prohibition shall also apply to any licensee who permits any person, as borrower, or as endorser, guarantor, or surety for any borrower, or otherwise, to owe directly or contingently or both to the licensee at any time the sum or more than Three Hundred ($300.00) Dollars for principal.

"Sec. 14. Every licensee shall:

"(a) Deliver to the borrower at the time the loan is made, a statement in the English language showing in clear and distinct terms the amount and date of the loan and of its maturity, the nature of the security, if any, for the loan, the name and address of the borrower and of the licensee, and the rate of interest charged. Upon such statement there shall be printed in English a copy of Section Thirteen (13) of this Act;

"(b) Give to the borrower a plain and complete receipt for all payments made on account of any such loan at the time such payments are made;

"(c) Permit payment of the loan in whole or in part prior to its maturity with interest on such payment to the date thereof;

"(d) Upon repayment of the loan in full mark indelibly every paper signed by the borrower with the word "Paid" or "Cancelled" and release any mortgage, restore any pledge,

cancel and return any note, and cancel and return any assignment given by the borrower as security.

"Sec. 15. No licensee shall take any confession of judgment or any power of attorney. Nor shall he take any note, promise to pay or security that does not state the actual amount of the loan, the time for which it is made, and the rate of interest charged, nor any instrument in which blanks are left to be filled after execution.

"Sec. 16. No assignment of or order for the payment of any salary, wages, commissions or other compensation for services, earned or to be earned, given to secure any such loans shall be valid unless the amount of such loan is paid to the borrower simultaneously with its execution; nor shall any such assignment or order, or any chattel mortgage or other lien on household furniture then in the possession and use of the borrower be valid unless it be in writing signed in person by the borrower; or, if the borrower is married, unless it be signed in person by both husband and wife; provided that written assent of a spouse shall not be required when husband and wife have been living separate and apart for a period of at least five months prior to such assignment, order, mortgage or lien.

"(a) Under any such assignment or order for the payment of future salary, wages, commissions or other compensation for services, given as security for a loan made under this Act, a sum equal to ten (10) per centum of the borrower's salary, wages, commissions or other compensation for services shall be collectible from the employer of the borrower by the licensee at the time of each payment of salary, wages, commissions or other compensation for services from the time that a copy of such assignment verified by the oath of the licensee or his agent, together with a similarly verified statement of the amount unpaid upon such loan, is served upon the employer.

"Sec. 17. No person, co-partnership or corporation engaged in the business of making loans of money, except as authorized by this Act, shall directly or indirectly charge, contract for or receive any interest or consideration greater than ten (10 per cent.) per centum per annum upon the loan, use or forbearance of money, goods or things in action, or upon the loan, or use of credit, of the amount or value of Three Hundred ($300.00) Dollars or less.

"(a) The foregoing prohibition shall apply to any money-lender who as security for any such loan, use or forbearance of money, goods or things in action, or for any such loan or use of credit, makes a pretended purchase of property from any person and permits the owner or pledgor to retain the possession thereof, or who by any device or pretense of charging for services or otherwise seeks to obtain a greater compensation than is authorized by this Act.

"(b) No loan for which a greater rate of interest or charge than is allowed by this Act has been contracted for or received, wherever made, shall be enforced in this State, and every person in any wise participating therein in this State shall be subject to the provisions of this Act.

"Sec. 18. Any person, co-partnership or corporation and the several officers and employees thereof who shall violate any of the provisions of Sections One (1), Eight (8), Twelve (12), Thirteen (13) or Seventeen (17) of this Act shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than Five Hundred ($500.00) Dollars, or by imprisonment of not more than six (6) months or by both such fine and imprisonment in the discretion of the court.

"Sec. 19. This Act shall not apply to the customary loan transactions made by any person, co-partnership or corporation doing business under any law of this State or of the United States relating to banks, trust companies, building

and loan associations, licensed pawnbrokers, Morris Plan Companies, or Companies doing a similar business, or to *bona fide* purchasers of choses in action or of property or to counties having a population of less than forty thousand, taken from 1925 census or any subsequent census.

"Sec. 20. If any clause, sentence, paragraph or part of this Act shall, for any reason, be adjudged by any court of competent jurisdiction, to be invalid, such judgment shall not affect, impair or invalidate the remainder of this Act, but shall be confined in its operation to the clause, sentence, paragraph, or part thereof directly involved in the controversy in which such judgment shall have been rendered.

"Sec. 21. All Acts or parts of Acts inconsistent with the provisions of this Act are hereby repealed, and this Act shall take effect September 1st, 1925.

"Approved June 3, 1925."

Sections 3999 *et seq.,* Section 7880, Compiled General Laws.

WHITFIELD, J.—The writ of error herein was allowed and taken under the statute to a judgment remanding the petitioner in habeas corpus proceedings. It is contended that Chapter 10177, Acts of 1925, General Laws, Sections 3999 *et seq.,* Section 7880, Compiled General Laws, set out in the statement, is a local or special law not of uniform operation throughout the State, and that the punishment prescribed therein for a violation of its provisions, conflicts with Sections 20 and 21 of Article III of the State Constitution which forbid local or special laws in enumerated cases including laws "for the punishment of crime or misdemeanor."

The statute does not apply "to counties having a population of less than forty thousand, taken from 1925 census or any subsequent census." The organic sections require laws "for the punishment of crime or misdemeanor" to be

of "uniform operation throughout the State," but do not require such laws to be of *universal* operation, and permits classifications of subjects for statutory regulation by general laws, when the classification has a basis in real differences of conditions affecting the subject regulated, and the classification applies in general to all similarly conditioned with reference to the subject regulated; and a classification may be based upon the population of counties, even though the Act does not embrace all counties that could have been included, or omits some that need but do not have statutory regulation, where the classification made is not merely capricious. State ex rel. v. Daniel, 87 Fla. 270, 99 So. 804; Sparkman v. Co. Budget Com. et al., 103 Fla. 242, 137 So. 809. This Act requires the exercise of a governmental function in licensing and regulating the business of making small loans, and is designed to remedy an evil which the Legislature conceivably and reasonably found to exist chiefly in the more populous counties of the State. This renders the classification valid, even though the evil also exists and is unregulated in other counties to which the Act does not apply. The statute is potentially applicable to every county of the State. Collier v. Cassady, 63 Fla. 390, 57 So. 617; Sparkman v. Co. Budget Com. et al., 103 Fla. 242, 137 So. 809.

If Chapter 10177 is a local or special law, its subject is not "the punishment of crime or misdemeanor," but it is "an Act to license and regulate the business of making loans in certain counties in sums of three hundred ($300.00) dollars or less," etc. As an incident to the regulations prescribed, the Act declares that "any person, co-partnership or corporation and the several officers and employees thereof who shall violate any of the provisions of Sections 1, 8, 12, 13, 17 of this Act shall be guilty of a misdemeanor and upon conviction thereof shall be punished," etc.

The Constitution forbids local or special laws "for the *punishment* of crime or misdemeanor." This does not forbid the enactment of a local law prescribing governmental regulations under the police power, and providing that a violation of its provisions shall be a misdemeanor. The word, "Crimes," shall include all misdemeanors. Section 7102 (5004), Compiled General Laws. If the portion of the Act prescribing punishment for violations of the Act is not merely incidental to the subject of the Act, and is invalid under Section 20, Article III, Constitution, it may be disregarded in accord with Section 20 of the Act; and violation of the provisions of the local law being made a misdemeanor, which is a crime, may be punished under the general law, Section 7104 (5005), Compiled General Laws, which is as follows:

"The punishment for commission of crimes other than felonies in this State, when not otherwise provided by statutes, or when the penalty provided by statute is ineffectual because of constitutional provisions, or because the same is otherwise illegal or void, shall be a fine not exceeding two hundred dollars or imprisonment not exceeding ninety days, or both, at the discretion of the court." Stinson v. State, 63 Fla. 42, 58 So. 722.

Whether State statutory enactments should be by general law or by local or special law, or whether an enactment is a general law or a local or special law, is a matter for State determination when the equal protection of the laws or other provision of dominant Federal law is not involved in the terms or in the application of the State enactments. But whether a classification in a State statute, whether it is a general law or a special or local law, does in its terms or in its operation deny the equal protection of the laws or violate any other provision of the paramount Federal law,

is to be ultimately determined by the Federal Supreme Court when duly presented.

The petition on which the writ of habeas corpus was issued alleges that Chapter 10177 "violates Article XIV of the Constitution of the United States is that said law deprives petitioner of his liberty or property without due process of law, and denies to him equal protection of the laws with other citizens within the jurisdiction of the State of Florida, in that petitioner is denied the rights and privileges because he is a resident of a county of more than forty thousand (40,000) population, which rights and privileges are enjoyed by all other citizens who are residents of counties of less than forty thousand (40,000) population."

The second contention here is that "the statute attempts an arbitrary discrimination in deprivation of defendant's constitutional right secured and declared by Sections 1 and 12 of the Constitution of the State, and Fourteenth Amendment to the Federal Constitution."

The argument has relation to the clause of the Federal Constitution forbidding the State to "deny to any person within its jurisdiction the equal protection of the laws," as well as to Sections 1 and 12 of the Declaration of Rights of the State Constitution.

Chapter 10177, Laws of Florida, 1925, enacts regulations of a class of business, to-wit: of making small loans in all the counties of the State having 40,000 or more of population, the regulations having reference to the business done as defined in the Act and not to the residence or citizenship of those who engage in such regulated business. It is "An Act to License and Regulate the Business of Making Loans in Certain Counties in Sums of Three Hundred ($300) Dollars or Less, Secured or Unsecured, at a Greater Rate of Interest Than Ten Per Centum Per Annum; Prescribing

the Rate of Interest and Charge Therefor, and Penalties for the Violation Thereof, and Regulating the Assignment of Wages or Salaries, Earnéd or to Be Earned When Given as Security for Any Such Loan."

Section 1 forbids any person, co-partnership or corporation to engage in the business of making loans of $300.00 or less and to charge more than ten per cent. per annum therefor, without first obtaining a license for engaging in such business. Section 13 limits the rate of interest that may be directly or indirectly charged under such license. Section 18 makes a violation of stated sections of the Act a misdemeanor and prescribes a punishment therefor. Section 19 is as follows:

"This Act shall not apply to the customary loan transactions made by any person, co-partnership or corporation doing business under any law of this State or of the United States relating to banks, trust companies, building and loan associations, licensed pawnbrokers, Morris Plan Companies, or Companies doing a similar business, or to *bona fide* purchasers of choses in action or of property, or to counties having a population of less than forty thousand, taken from 1925 census or any subsequent census."

As shown by its preamble, set out in the statement hereto, the enactment is designed to remedy an existing evil, which the Legislature conceivably and reasonably could, and apparently did, determine was more pronounced and harmful in the more populous counties of the State. The law-making power may under its police power, as was done in this case, enact regulations that are not all embracing; and may classify regulatory enactments with reference to degrees of evil and to the location where the evil is most harmful, without denying the equal protection of the laws. If the greatest of the evils sought to be remedied exist in the counties having relatively large populations, statutes

may determine the lines of differentiation without denying to any person the equal protection of the laws. No one can justly or legally demand all the rights or exceptions enjoyed by others if there is a reasonable basis for the discrimination complained of; and those who assert an unjust discrimination by the State in violation of the Federal Constitution, have the burden of showing that the asserted discrimination has no conceivable basis in differences of conditions, sufficient to justify the statutory regulation complained of. No such showing is made in this case. The opportunities in the larger counties for the abuses sought to be remedied by this statute afford a sufficient basis for a classification on a 40,000 population unit. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369; Mutual Loan Co. v. Martell, 222 U. S. 225, 32 Sup. Ct. 74, 56 L. Ed. 175; Keokee Consolidated Coke Co. v. Taylor, 234 U. S. 224, 34 Sup. Ct. 856, 58 L. Ed. 1288; Miller v. Wilson, 236 U. S. 373, 35 Sup. Ct. 342, 59 L. Ed. 628; Rast v. Vandeman & Lewis Co., 240 U. S. 342, 36 Sup. Ct. 370, 60 L. Ed. 679; Whitney v. California, 274 U. S. 357, 47 Sup. Ct. 641, 71 L. Ed. 1095. In State ex rel. v. Bryan, 87 Fla. 56, 99 So. 327, there was *unjust* discrimination by counties among common owners of wild game in the State.

The exceptions contained in Section 19 as to the customary loan transactions made *under any laws relating to* banks, trust companies, building and loan associations, licensed pawnbrokers, Morris Plan Companies or other companies doing a similar business, do not deny the equal protection of the laws to anyone, since if those enumerated in the exceptions are otherwise regulated by law, they may legally be excepted from the operation of this statute; and if they are not so regulated and are doing business in the State, the exception does not apply to them. The exception

of *bona fide* purchasers of choses in action or of property, is based on the very substantial difference between a loan and a purchase.

The exception from the statute of counties having a population of less than forty thousand has reasonable practical basis of classification in conceivable substantial differences in the degrees of the evil sought to be remedied. Counties of larger population afford greater opportunities for extortion in making small loans to the needy in populous communities. The line of demarcation between counties being for legislative determination when, as here, it is not shown to be merely arbitrary.

Chapter 10177 operates as an exception to the general usury laws of the State, in the circumstances in which it operates. Even if the mere fact that the statute does not operate in some counties, presents a Federal question, the classification conceivably has a basis in differences of density of population and the conditions incident thereto with reference to the governmental regulations involved in this case, the particular line of separation being for legislative determination, no merely arbitrary action being shown.

The statutory regulations referred to are made under the State police power and they do not violate any right secured by Sections 1 and 12 of the Declaration of Rights of the Constitution; which sections appear in the Statement.

Error is asserted on the judgment against the petitioner in the Circuit Court for costs of the ministerial officers of the court. Section 7, Declaration of Rights, Constitution, provides that "the writ of habeas corpus shall be grantable speedily and of right, freely and without costs." Writs of habeas corpus are "grantable" only by certain courts and judges, viz.: the Circuit Courts, the Circuit Judges, the Supreme Court and the Justices thereof. It does not appear that costs were assessed for granting the writ. The

provision of Section 14, Declaration of Rights, Constitution, that "no person shall be compelled to pay costs except after conviction of a final trial," has reference to criminal prosecutions. See State v. Newman, 24 Fla. 33, 3 So. 467; Buckman v. Alexander, 24 Fla. 46, 3 So. 817.

As to costs in habeas corpus cases, see 5441 (3577), Compiled General Laws. The judgment in this habeas corpus proceeding is a final judgment, or else a writ of error would not lie to the judgment.

No argument or authority is adduced to show that ministerial officers are not entitled to costs in habeas corpus cases.

Affirmed.

DAVIS, C. J., and TERRELL and BROWN, J. J., and JOHNSON, Circuit Judge, concur.

BUFORD, J., dissents.

DAVIS, C. J., (Concurring).—By the common law concerning crimes as adopted in the United States, no rate of interest is illegal in the absence of a statutory enactment, and by the common law concerning civil matters as adopted in this country no rate of interest is illegal unless so great as to be unconscionable. The *crime* of usury is therefore, *malum prohibitum,* not *mala in se.* See 27 R. C. L. 203.

Since the prohibition of usury under criminal penalty rests wholly in statute, the Legislature in enacting usury laws may make them as broad or as narrow as it may deem wise, taking care only that due process of law is not denied and that unequal protection of the laws does not result.

The history of statutory enactments in this State is that usury of all kinds was first defined and prohibited by a statute which applied to all alike. See Chapter 5960, Acts of 1909. Now Sections 6839-6845 C. G. L, 4851-4858, R. G. S.

In passing the original usury law the Legislature had the power then to make certain exceptions delimiting its broadest scope, because the Legislature in enacting statutes does not have to cover the whole field of an evil permitted to be suppressed.   Middleton v. Texas P. & L. Co., 249 U. S. 152, 39 Sup. Ct. Rep. 227, 63 L. Ed, 527 ; Rosenthal v. New York, 226 U. S. 260, 33 Sup. Ct. Rep. 27, 57 L. Ed. 212, and under this principle of constitutional law just cited a Legislature can first pass a general law covering the whole field of an evil designed to be suppressed, and later contract the scope of its first enactment by subsequent amendments. This is a common legislative practice which has never been successfully challenged.   Dominion Hotel v. Arizona, 249 U. S. 265, 39 Sup. Ct. Rep. 273, 63 L. Ed. 597.

My view is that Chapter 10177, Acts of 1925, is in *pari materia* with all the other usury laws of Florida.   Amos v. Mathews, 99 Fla. 1, 126 Sou. Rep. 308.   And being no more than a permissible exception to the original operation of the general usury laws, an exception that could have been written into such general usury laws in the first instance, I am unable to see upon what basis the 1925 Act must now fall on the ground of an alleged denial of the equal protection of the laws.

The courts have repeatedly rejected the idea that equal protection of the laws means that the Legislature may not deal with a conspicuous class in a particular way, although logically that class may not be distinguished in any degree from others not embraced in the class covered by the law, but which might have been or should be as a matter of policy included.   Central Lumber Co. v. State of South Dakota, 226 U. S. 157, 33 Sup. Ct. Rep. 66, 57 L. Ed. 164; Reymann Brewing Co. v. Brister, 179 U. S. 445, 21 Sup. Ct. Rep. 201, 45 L. Ed. 269; Noble v. Carlton, 36 Fed. (2nd) 967.

· Suppose that at the time Chapter 10177 was enacted, there had been no other usury laws at all on the statute books. This fact would not have prevented the Legislature from singling out for special regulation that class of money-lenders who fall within the purview of Chapter 10177, *supra*, nor preclude the Legislature's right to regulate them to the extent provided for by that Act. Upon what principle therefore can this Court say that an Act passed in 1925 is rendered unconstitutional because it happens to delimit the scope of an earlier Act on the subject of usury in 1909? Since the 1925 Act is the latest expression of the Legislature would not it supersede the 1909 Act if both cannot constitutionally stand together on the same statute books?

I think the answer to all these questions is that both Acts must stand. This is so because the 1925 Act would be valid if we had no usury· statute at all, and were governed solely by the common law. As has been pointed out, at common law charging excessive or unreasonable interests, or usury, was no criminal offense whatsoever. Hence the mere presence on the statute books of an earlier usury law conflicting (if we put it that way) with the 1925 Act, does not render the last Act of the Legislature invalid, if the 1925 Act would be valid in relation to the common law, on the subject dealt with.

The *right to charge* usury is not given by any of these statutes. On the contrary *the act of charging usury* could be exercised as a common law right if all the statutes were repealed. It was not punishable at all as a criminal offense to charge excessive interests, and an excessive interest charge was only redressible in the civil courts on certain equitable principles when deemed "unconscionable." So all the statute of 1925 says in effect is that if you, as one of the designated class of money lenders, can get a spcial license to do it, you can then exercise your common law privileges of

exacting an amount of interest unlimited by law as to rate, except as provided by the statute which limits it only as not to exceed 3½ per cent. per month on a principal that does not exceed $300.00.

Can it be said that the mere failure of the 1925 Act to dispense with the common law in a certain classified field described in that Act, renders the statute violative of the Constitution, which in the absence of any statutes at all on the subject, would leave the interest rates of this State wholly unlimited?

In providing for licenses, the Legislature can select a conspicuous class to be licensed and exclude all others. Under Chapter 10177, Act of 1925, only licensed persons of a conspicuous class defined by that statute are permitted to obtain licenses. Unless we are compelled to say that the Legislature is forbidden to classify for license purposes, money lenders engaged solely in lending money in amounts not exceeding $300.00 a loan, we cannot strike these statutes down.

It has been definitely held that a classification may be made based on size alone. Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. Rep. 190, 55 L. Ed. 128.