## MAIZE v. THE STATE.

Prosecution under the act of *March*, 1853, for retailing spirituous liquor without license. The defendant admitted the selling without license, as charged. *Held*, that the question of the power of the legislature to prohibit the sale of spirituous liquor was not involved in the cause. *Held*, also, that the defendant's admissions were sufficient to authorize a conviction, if the law was constitutional.

The judiciary look to the acts of the legislature with great respect, and reconcile them with the constitution, and sustain them, if possible.

The presumption that an act of the legislature is in violation of the constitution is not to be indulged, unless it is clearly subversive of that instrument.

Such a presumption cannot arise from the mere fact that an act is imperfect or impolitic.

It is the right and duty of the courts to inquire into the constitutionality of the acts of the legislature, whenever such questions are judicially presented.

A construction of the constitution by the legislature, where it is restrictive of legislative authority; or where the constitutional question has not been considered by that body; or where such legislative construction is not continuous and concurring, is not entitled to much weight; and as between two legislative constructions differing from each other, that more nearly contemporaneous with the constitution, would seem to be the better authority.

Sections 22 and 23 of the constitution of 1851, were designed to remedy the evil of local and special legislation which had grown up under the old system.

The law-making power being vested by the constitution of 1851 in the general assembly, the exercise, by any other body, of the power to make, sanction, suspend, or give effect to, the laws is necessarily excluded.

The term "operation of the laws," as used in s. 26 of art. 1 of the constitution of 1851, seems to mean, their taking effect and continuing in force.

So much of the act of *March*, 1853, "to regulate the retailing of spirituous liquor," &c., as relates to the popular vote, is in conflict with ss. 25 and 26 of art. 1, and, also, of ss. 22 and 23 of art. 4, of the constitution.

Submitting laws to the vote of the people in their primary capacity, is subversive of the representative system and inconsistent with the constitution.

It is, also, inconsistent with the constitutional provision requiring the yeas and nays on the final passage of a bill.

As a license law, the act in question is complete without the part relating to the township vote; and a license may issue upon the filing of the requisite bond.

APPEAL from the *Tippecanoe* Court of Common Pleas.

STUART, J.—This was a prosecution under the act of *March*, 1853, for retailing spirits without license. *Maize* admitted that the liquor was sold as charged. The cause was submitted to the Court. Finding and judgment for the state.

Among the "agreed facts" are the following: The prosecuting attorney admitted that at the time of the sale, the act of *March* 4, 1853, was not of uniform operation throughout the state, in this, viz., that some townships voted "license," others "no license;" that the township in which the liquor was sold voted "no license;" and that the act in question was, at, &c., in force, so far as publication could make it.

It is not worth while to inquire whether it was competent for the parties to make admissions of matters of law which the courts must judicially notice.

Counsel discuss several points as arising in the record, and which will be briefly noticed in their order.

First. Can the general assembly prohibit the sale of spirituous liquors?

This question does not seem to be involved in the case. The late act is not, either in terms or in its practical effect, prohibitory throughout the state. That it may become so, depends upon the happening of a particular and not very probable event. Whenever that question is di-

*Nov. Term,*
*1853.*

MAIZE
v.
THE STATE.

*Tuesday,*
*November 29.*

rectly presented, it will be time enough to inquire whether it is any longer open for discussion, since the series of elaborate opinions in the liquor cases, in 5 How. (U. S.) R., 577. On this point it is not deemed necessary to go beyond the decision in *Bepley* v. *The State*, at the last term. (1)

The second point is stated thus: "Admitting the act to be constitutional, is the evidence sufficient to justify the finding of the Court?"

We cannot see why it is not clearly so. *Maize* admits the sale of the liquor as charged—admits everything the state could be required to prove to entitle her to a conviction. If there is any prerequisite in the statute which is constitutional and with which he has not complied, then are the finding and judgment of the Common Pleas fully sustained.

The third point is presented in these words: "Is the act of *March* 4, 1853, or so much thereof as requires it to be submitted to a vote of the people of the several townships, constitutional?"

Such questions are always regarded by the courts as of serious importance. The judiciary look to the acts of the legislature with great respect, and reconcile and sustain them, if possible. The general assembly is the immediate exponent of the popular will,—expressly delegated to clothe that will with the forms of law. The presumption that such a body has sanctioned enactments in violation of the constitution, is not to be lightly indulged. That the act is imperfect or impolitic is not enough. These defects subsequent legislation can remove by amendment or repeal. To bring its validity within the control of the courts, it must be clearly subversive of the constitution. *Fletcher* v. *Peck*, 6 Cranch 87.

It is not necessary to dwell on the power and duty of the judiciary to inquire into the constitutionality of the acts of the general assembly, when a proper occasion occurs. 1 Kent 450. The relative position of the co-ordinate branches is generally well understood and readily conceded. But in the argument of this cause great stress

is laid on the practical construction which, in the case at bar, the general assembly has given to the constitution— and the same argument is pressed in other cases—as though it were presumption in the courts, composed of few members, to question the correctness of so numerous a body. Were such a doctrine admitted, all constitutional questions must begin and end with the legislature; for the argument would be equally applicable and equally conclusive in every case that might arise.

And yet there are considerations which might somewhat abate this blind respect for legislative exposition. Where the constitutional provision is restrictive of legislative authority, the construction given by the legislature, sitting in judgment on the extent of its own powers, could not be entitled to much weight. "To admit such an exposition as binding," says a late writer, "would be to permit the department restricted to do away with the very restriction imposed." Smith's Comm. 441. Under our political economy and written constitution, *Blackstone's* omnipotence of parliament is comparatively an empty figure of speech. *Marbury* v. *Madison*, 1 Cranch 137.— 1 Kent's Comm. 426. The general assembly is a mere agent of the people intrusted with certain delegated powers. The constitution is the letter of agency. In its action the assembly is governed *sub modo* by the same rules as other agents: whenever it transcends its authority, its acts are void.

When we further reflect on the manner in which important enactments are often passed through the forms of legislation, it would seem that our respect for the construction of the constitution impliedly given by such acts, might be profitably qualified. If, for instance, it appears from the journals, which are the records of the general assembly, that the constitutionality of the act had not been considered, such a tacit interpretation of the constitution, even by so numerous and respectable a body, could scarcely be considered of much weight, or pressed upon us as authority. Thus, in the present instance, bill no. 142 of the house, which subsequently became the act

Nov. Term, 1853.

MAIZE
v.
THE STATE.

of *March* 4, 1853, does not appear to have been referred to the judiciary committee of either house. The question of its constitutionality was not even agitated.

Where the chain of legislative decision is not continuous, it detracts very much from its authority. A series of interpretations by different assemblies to the same effect, acquiesced in and acted upon for considerable time, would be entitled to serious consideration. But this looking to what has been decided, a feature so beneficial in the courts, is rare in the legislature. For very obvious reasons the principle which may have been partially established by previous assemblies, is not regarded as binding. Hence, there is not that uniformity and accumulated weight of authority, which, on almost all topics, obtain in judicial decisions. Even the two sessions held under the new constitution, have not tended to fortify legislative construction. In accordance with the views just suggested, the second assembly has shown its independence of the first. What was unconstitutional in the one, was constitutional in the other. The action of the first was not respected as authority by the second.

Thus, the acts embodied in chapters 11, 21, 22, 55, 59, 89, 90, 91, 96, 97, 108, &c., of the laws of 1853, were passed without seemingly a constitutional scruple. Yet most of these acts had in principle been decided by the previous assembly, almost *nem. con.*, as clearly unconstitutional. These enactments are referred to, to illustrate the fickleness of legislative construction on constitutional questions, without intimating any opinion on statutes not judicially before us. Legislative constructions thus opposed to each other, hardly deserve to be quoted as authority. If there is any preponderance, it would seem to be with that which was more nearly contemporaneous with the constitution.

The first, second and third sections of the act of *March*, 1853, provide for taking a vote by townships, annually, at the *April* election, on the license question; and that without the consent of a majority of the legal voters of the proper township "for license," none can issue. In

connection with the affirmative vote, a bond is also re-
quired.   The 19th section expressly repeals all other laws
on the subject of retailing spirituous liquors.   The 20th
section declares an emergency, and that the act take effect
and be in force from and after its passage and publica-
tion.   It was published on the 19th of *March*, 1853.

Several constitutional provisions are referred to, with
either the letter or spirit of which, it is contended, the act
of *March* 4, 1853, conflicts.

Thus—

" The legislative authority of the state shall be vested
in the general assembly, which shall consist of a Senate
and House of Representatives."   Sec. 1, art. 4.

No law shall be passed, the taking effect of which
shall be made to depend upon any authority, except as
provided in this constitution.   Sec. 25, art. 1.

Local laws for the punishment of offenders and for
the regulation of county and township business, are ex-
pressly forbidden.      Sec. 22, art. 4.

"Whenever a general law can be made applicable, all
laws shall be general and of uniform operation through-
out the state."   Sec. 23, art. 4.

These provisions are all in the nature of restrictions
on the legislative authority.   A legislative construction
of them falls within the rule above indicated.

The evil to be remedied by sections 22 and 23, above
quoted, was the local and special legislation so prevalent
under the old system.   It had grown into such magnitude
that counties, townships, and even school and road dis-
tricts, had special laws for the management of their local
affairs.

The practice of submitting enactments on vexed ques-
tions to the popular vote, had obtained to some extent
under the old constitution—whether consistently with
even that instrument is not for us to inquire.   Such was
the school law approved *January*, 1849.   Such, also, were
several license laws embracing more or less territory.
The legislature had thus, in some measure, ceased to be
a representative body, and was gradually becoming a

mere proposer of laws for the consideration and final action of the people.

To remedy these evils—to restore the state from being a coterie of small independencies, with a body of local laws, like so many counties palatine, to what she should be, and was intended to be, a unity, governed throughout her borders on all subjects of common interest, by the same laws, general and uniform in their operation—the restrictions in sections 22 and 23 were embodied in the constitution.

By the adoption of that instrument, both the honor and the responsibility of passing general laws were devolved on the general assembly. Hence, the idea of any other power to make, sanction, or suspend the laws, or to give them effect, is necessarily excluded.

Let us inquire whether the taking effect of the act of *March*, 1853, in whole or in part, is made to depend upon any authority unknown to the constitution.

The words "take effect," "be in force," "go into operation," &c., have been used interchangeably ever since the organization of the state. The "operation of the laws," as used in the 26th sec., art. 1, seems to be their taking effect and continuing in force.

The act in question consists of two parts;—the one points out the mode of obtaining license;—the other prescribes the punishment for selling without license. The penal part of the act went into operation immediately upon publication. The provision for license did not. Between the 19th of *March* and the *April* election, no license could issue in any part of the state; the bond and the affirmative vote of the township being both essential. Had the people of each township voted "no license," there would have been no operative license law in the state for one year from *April*, 1853. And had the people so voted every year for all time to come, that part of the act relating to license could never have had any force, effect or operation as a law. So that the taking effect of the act, or so much of it at least as provided for the issue of license—in other words, whether there should be any

power to issue license—was made to depend on the vote of the people of each township.

If the townships vote diversely, as it is understood they have, then, in practical operation, it is a local law. In the townships which vote "license," the license feature takes effect by virtue of that vote. In the townships voting "no license," it has no force or operation in consequence of such vote. Thus has the general assembly merely proposed the license feature to the people, for them to give it vitality or reject it by townships.

It seems needless further to inquire whether the act in question is general and uniform in its operation. A law expressly providing for license in this township and no license in that, by name, and so on alternately throughout the state, would not, in its operation, essentially differ from this. Had the question been submitted to a vote of the state at large, the license feature, whether adopted or rejected, would have, at least, had the recommendation of uniformity. Besides, such an act, it is presumed, would not have had plausibility enough to mislead any one into the belief that it was constitutional. But this act is a specious and accommodating refinement on local legislation—ingeniously comprehensive—annually presenting to the townships an aspect suited to the taste of each.

In some respects, there is a very strong similarity between the school law of 1849 and the liquor act of 1853. If "county" be substituted for "township," the two acts are scarcely to be distinguished, in this, that their taking effect is made to depend on the action of the people in their primary capacity. The school law like the liquor law, was declared in force from and after its publication. Yet the same section provides that it should be left to the popular vote of each county. It is believed that *Montgomery, Sullivan,* and some other counties, never adopted the school law, so that practically it remained a local law, made so, like the license act, by a contingency over which the legislature had no control.

Many legislative acts, though declared in force from their passage, are inoperative until the officers charged

with their execution are elected or appointed. But those are easily distinguishable from the school law of 1849 and the license act of 1853. In such elections the question is, who shall be designated to execute the law—not as here, shall the law be permitted to go into operation— shall any one be suffered, on any terms, to execute it or act under it.

Nor is it easy to see how, on principle, a public measure can be submitted, in the abstract, to a popular vote, consistently with the representative system. In effect it is changing the government to what publicists call a pure democracy, such as *Athens* was. If one enactment may be submitted to such vote so may another, so might all: thus would the representative system be wholly subverted.

If the people desire to resume directly the law-making power which they have delegated to the general assembly, they have only to change the constitution accordingly.

Again, if this system of drafting bills with a double aspect, leaving it to the people which they will adopt, is to prevail, of what use is the constitutional provision requiring the yeas and nays on the final passage? If the object of this provision was to subject the action of the representative to the inspection of his constituents, it is thus completely evaded. For the vote, whether yea or nay, means nothing, indicates nothing; neither adopts nor rejects any policy, except that it ingeniously shifts the responsibility of final action from the legislature to the people.

If we regard the act of *March*, 1853, in force from its passage, as is claimed in argument, then we conceive it to be in conflict with sec. 26 of art. 1. That section reads, "The operation of the laws shall never be suspended, except by authority of the general assembly." An illustration of the exercise of this power occurs in chapter 1, Special and Local acts 1852, entitled, "an act to suspend" certain acts therein named. That the operation of the act of *March*, 1853, was left to be suspended

or otherwise, according to the vote of each township, is so evident as to need only to be stated. The township which this year votes "license," and thus puts the law into operation, may next year vote "no license," and thus suspend its operation. Under the constitution, the legislature alone can suspend the operation of the laws. And this power is not distinguishable from any other legislative power. It cannot be delegated. The suspending act is itself a law, and must emanate from the law-making power—specifying the act suspended, and, perhaps, the period of suspension. An existing law is a rule of action, open to every citizen to comply with its requisitions. But in case of a negative vote, there is no law left to be complied with. As to that township, it has no effect or operation. It is suspended.

As a license law, the act is complete in itself, without the part relating to the township vote. So much as relates to that vote may be considered as stricken out; and the license issues on filing the requisite bond. *Maize* having sold without such license, was properly convicted. He was bound at his peril to know the law, in violation of which he assumed to act.

*Per Curiam.*—The judgment is affirmed with costs.

*J. Pettit* and *W. F. Lane*, for the appellant.

*L. Reilly, G. S. Orth, E. H. Brackett, R. A. Riley, N. B. Taylor* and *J. Coburn*, for the state.

(1) *Ante*, p. 264.