STATE, *ex rel.* KENNETH MCLEOD, v. R. A. HARVEY, *et al.*

170 So. 153.
Opinion Filed October 13, 1936.

*James Messer, Jr.,* for Relator;

*R. W. Ashmore, Jr., H. H. Wells, B. K. Roberts, William K. Whitfield* and *C. N. Ashmore* (all of Tallahassee), for Respondents;

*William J. DeHoff, DeHoff & DeHoff* and *Elmer E. Hazard,* as *Amici Curiae.*

WHITFIELD, C. J.—The pleadings and statute involved are stated in the opinion prepared by Mr. Justice BUFORD.

Chapter 17257, Acts of 1935, provides for licensing and regulating as well as for taxing defined machines commonly called "slot machines" in the several counties of this State; and the provision of the statute that after the polling of a stated vote in any county at a general election, no such machines shall be licensed to operate in such county, is not an unlawful delegation of legislative power to the electors of a county, since the Act itself, and not the vote, forbids the licensing of the machines when the required vote is cast.

The operation of the provision forbidding the defined machines to be licensed to operate in counties where a required vote has been duly cast, does not cause a lack of uniformity in the taxing provision of the Act, since the Act does not make the tax inapplicable in any county where the machines may lawfully be licensed to operate.

The subject of the tax provision of the statute is licensed machines. Granting the licenses is to be discontinued in any county upon a stated contingency. If there are no machines licensed in a county because the statute forbids it, the tax provision of the statute is not thereby repealed or suspended in the county; but there is then no subject in the county upon which the tax provision may operate. Loss of revenue or the discrimination involved in forbidding the machines to be licensed in some counties, results from the statutory exercise of the police power for the general welfare, and does not violate the Constitution.

The authorized vote of the electors of a county to express the public will, upon which the statute forbids the machines to be licensed in the county, has substantial relation to the provisions of the Act and merely determines a contingency upon which the statute itself forbids further licensing of the machines. The statute forbids the machines to be licensed in any county upon the event of an authorized stated

vote of the electors of the county; and it is not made to appear that such provision so affects the taxing provision of the statute as to violate any provision of the Constitution.

The motion to quash the alternative writ of mandamus is denied, and peremptory writ will issue unless return consistent with this opinion is filed within three days.

It is so ordered.

TERRELL, BROWN and DAVIS, J. J., concur.

ELLIS, P. J., and BUFORD, J., dissent.

DAVIS, J. (concurring with WHITFIELD, C. J.).—I concur in much that is said in the opinion of Mr. Justice BUFORD, but not in the conclusion that has been reached by him on the premises he has assumed and stated.

Passing *sub silentio* the propriety of entertaining an attack on the constitutionality of Section 12A of Chapter 17257, Acts of 1935, in a proceeding of this kind wherein the respondents have only ministerial duties to perform in connection with the holding of the general election of 1936, which must be held at all events, it seems to me that said Section 12A of the Act is not amenable to the objection of unconstitutionality urged against it, for the reasons I shall hereafter set forth.

Chapter 17257, *supra,* commonly known as the "Slot Machine Act, undertakes to create and provide for conferring on certain specified applicants, a special and extraordinary license privilege, namely, the privilege of operating a particular type of gambling device for profit. Such privilege is one that the Legislature had authority to confer absolutely, or upon condition, and to make the condition of it precedent or subsequent. In the case of Chapter 17257, the Legislature has elected to confer the privilege on condition subsequent, the condition subsequent of the privilege being that it shall remain enjoyable only during such time

after the Act took effect as the voters of the respective counties of the State shall approve of its being enjoyed by failing to vote for its withdrawal in accordance with the Legislature's expressed determination that upon such contingency it shall expire.

It is therefore obvious that insofar as the Act in question provides for granting or withdrawing slot machine licenses by popular vote and by counties, it is solely an exercise of the police power of the State. This is so because absent the creation and continuance in existence of the special privilege conferred by the Act to engage in a business that would otherwise be a violation of the original laws against gambling, the revenue features of the Act have no subject upon which they can operate.

The revenue impositions of the "Slot Machine Act" may therefore be said to provide for the imposition of a State tax only upon a conditional privilege capable of being enjoyed and actually enjoyed in accordance with the permission that the Act gives to enjoy it. And since the Act confers only a conditional privilege, and not an absolute privilege, to procure licenses to operate slot machines (or to renew the same from year to year), the revenue features of the Act are only incidentally affected by the happening of the contingency specified as the condition upon which the privilege was granted in the first instance, the condition being that the privilege should cease to exist upon the contingency of an election expressing the will of a majority of a particular county's electors against its further enjoyment in that locality.

That the Legislature may provide for special privileges and licenses to be granted upon any reasonable conditions precedent or subsequent that may see fit to impose, and that it may provide for the withdrawal of such licenses and privi-

leges upon like reasonable conditions, can hardly be successfully gainsaid. Indeed, there has been no such contention made or argued in the present case.

So it is, Section 12A of Chapter 17257, Acts of 1935, amounts to nothing more nor less than a legislatively expressed condition subsequent upon which the licenses to operate slot machines were provided to be granted and accepted in the first instance. Upon the invocation of such condition subsequent the licenses once granted become incapable of renewal after they have duly expired according to their terms.

An election called under said Section 12A and resulting in a decision to withdraw slot machine licenses in a particular county is accordingly not a repeal of the Slot Machine Act as to such county. This is so, because the Act remains in force in such county and criminal prosecutions can be had under it therein against unlicensed operators of slot machines who may thereafter attempt to carry on their business absent the special statutory license so to do. On the contrary, such election under Section 12A of the Act is simply the happening of the contingency upon which the licenses were conditionally granted (and voluntarily accepted) in the first instance, so whatever effect the withdrawal may have on the total of the revenue collections contemplated under the Act, it is no different in substance than it would be if all the slot machine operators in a particular county should voluntarily yield to the unvoted for, but otherwise expressed, wishes of the inhabitants of that county and fail to apply for any new licenses in such county at the expiration of the license period.

Hence no matter if half the counties of Florida call elections to vote out slot machines and do vote them out under the terms of Section 12A, Chapter 17257, *supra,* neverthe-

less, in its police as well as in its revenue features, remains a uniform statewide law, effective as a revenue measure throughout the State to still collect from every privilege holder in the State the amount of tax imposed upon any privilege licensed and enjoyed under it, and that it is likewise effective as a police measure to secure the elimination under heavy criminal penalties of all slot machines for which no licenses exist in counties that vote out the privilege of licensing.

The "Small Loan Act" conferred a special privilege accompanied by special licensing on certain classes of money lenders. This privilege was nothing more nor less than a special permit to violate the usury law as to interest rates on certain classes of loans. It carried with it the imposition of special taxes on the privilege thus granted. That Act limited, however, the enjoyment of the privilege granted by attaching to it a condition that it would only be obtainable and enjoyable in counties of more than 45,000 population. The "Small Loan Act" was therefore a dual police and revenue measure that applied only in counties of a certain classification. Yet that measure was upheld as constitutional by this Court in the case of Beasley v. Cahoon, 109 Fla. 106, 147 Sou. Rep. 288.

And likewise in *Ex Parte* Lewis, 101 Fla. 624, 135 Sou. Rep. 147, it was held that it was not an unconstitutional delegation of legislative power to the Board of County Commissioners to confer on them the authority to declare a closed fishing season of so many days in each year, notwithstanding some county commissioners might fail to declare such a cloture and thereby bring about an open season in one county while in the adjoining county the season would be closed. See also Olds v. State, 101 Fla. 218, 133 So. 641.

Numerous other examples might be cited to show that the exercise of special statutory privileges can be constitutionally made dependent upon specified statutory contingencies and conditions provided to be decided by public bodies, executive officers or by popular vote, and that such provisions are generally considered by the courts as not amounting to an unconstitutional delegation of legislative power, because they do not affect the provisions of the law that the Legislature has passed, but merely affect the circumstances upon which the Legislature has decided in the law itself it shall become operative or inoperative, as the case may be. See: State, *ex rel.* Crim, v. Juvenal, 121 Fla. 69, 163 Sou. Rep. 569.

For the reason that I think it is plain that Section 12A of Chapter 17257, Acts of 1935, is not a referendum on the repeal of the slot machine law, or its revenue provisions, in particular counties desiring it, but is merely a means of expressing a condition upon which the Legislature intended the licenses to operate slot machines to be grantable in the first instance, I am of the opinion that said Section 12A is not unconstitutional as an unlawful delegation of legislative power to the electorate to suspend or repeal a validly enacted statute, but is sustainable as an appropriate legislative condition that may be annexed to any special statutory privilege that the Legislature may see fit to create and confer, whether taxed or untaxed in its enjoyment by the grantee.

In connection with what has just been stated, it is well to observe in conclusion that nothing in Section 12A of Chapter 17257 (Slot Machine Act) purports to authorize a local county referendum to be taken in Wakulla County, or in other counties, to decide the question whether or not slot machines duly licensed in Wakulla County shall continue to

pay the State taxes that are imposed on slot machines in all the counties as a revenue measure. On the contrary, the referendum is expressly limited to the question whether or not licenses for the continued operation of such slot machines shall be renewed or reissued in Wakulla County, or in other counties, after the will of the local voters has been expressed adverse to the issuance of such licenses.

If the referendum was confined to the incidence of the tax, obviously the point would be well taken that such referendum would be unconstitutional as an unauthorized attempted delegation of legislative powers to the voters to decide the policy of levying and collecting, or not levying and collecting, a State tax. Indeed, the Legislature has no authority to submit to a statewide referendum the question whether or not a particular statewide tax shall be levied or collected as that decision is one that the Legislature and the Legislature alone must make.

I agree with Mr. Justice BUFORD in his conclusion that elections held under Section 12A operate in future only, and that they have no effect as a wiping out of licenses already outstanding and paid for at the time of the voting, until the period taxed and paid for the enjoyment of the license has run. To hold otherwise, even if the language of the Act were susceptible of that construction, which I do not think it is, might render the section subject to the very criticism of unconstitutionality leveled against it as an unlawful delegation of legislative power to the voters of individual counties to affect the State revenues, since the denial of a privilege paid for in advance of the expiration of the license period, would impose the moral, if not the legal, duty on the Legislature to refund to the holders of unexpired licenses the money paid into the State

Treasury for the unused portion of the licenses cancelled or recalled *ante* the date of their expiration.

WHITFIELD, C. J., and TERRELL and BROWN, J. J., concur.

ELLIS, P. J., and BUFORD, J., dissent.

BUFORD, J. (dissenting).—We have for consideration motion to quash alternative writ of mandamus directed by this Court to the County Commissioners of Wakulla County, commanding them to:

"Assemble and convene in session within a reasonable time at your office in the Court House in Crawfordville in said County of Wakulla and in the State of Florida, and thereupon in open session to prepare, arrange and instruct the proper official, clerk or printer that may or will by law, or will by you, be selected to prepare the same, to so prepare and print the ballots to be used in Wakulla County in the General Election to be held in said County and in the State of Florida on the 3rd day of November, A. D. 1936, so that each Elector in said General Election duly qualified within said County to vote thereat and therein shall be given the privilege, right and opportunity to vote upon the question of whether the permits and licenses heretofore granted for the operation in Wakulla County, Florida, of any of the machines, or devices described in said Chapter 17,257, Laws of Florida, Acts of 1935, shall be continued or revoked, and that the ballots be otherwise prepared pursuant to the Constitution and Laws of the State of Florida relating to general elections, and do further command and direct you, the said respondents, and each of you, and the said Board of County Commissioners of Wakulla County, Florida, to submit to the electors of Wakulla County, Florida, at the general election to be held in said county and in the State of Florida on the 3rd day of November, A. D. 1936,

the question of whether any permit or license theretofore granted for the operation of any of the machines or devices described in Chapter 17,257, Laws of Florida, Acts of 1935, shall be continued or revoked; or that you, and each of you, in default thereof appear before this Honorable Court at the Supreme Court Building in Tallahassee, Leon County, Florida, on the 1st day of October, A. D. 1936, and then and there show cause why you fail so to do."

The motion to quash is on eight grounds, as follows:

"1. That said alternative writ of mandamus fails to show any legal duty on the part of these respondents to comply with the terms of the command thereof.

"2. That said alternative writ of mandamus shows upon its face that all legal duties imposed upon these respondents by Chapter 17,257, Acts of 1935, or by any constitutional provision or statute of the State of Florida, have been complied with by them.

"3. That the issuance of a peremptory writ of mandamus herein would control the discretion with which these respondents are vested under the laws of Florida involved herein.

"4. That it affirmatively appears by the said alternative writ of mandamus that Section 12A of Chapter 17,257, Laws of Florida, 1935, imposes no duty on these respondents to comply with the terms thereof because said Section 12A of Chapter 17,257, attempts to authorize these respondents to do an act which would be in violation of the Constitution and laws of the State of Florida.

"5. That it affirmatively appears by the alternative writ of mandamus that the alleged duty which the Relator is seeking to have the Respondents perform constitutes an unlawful and illegal delegation of legislative power to the people of Wakulla County, Florida.

"6. That it affirmatively appears by the allegations of the alternative writ of mandamus that Section 12A of Chapter 17,257, is an attempt on the part of the Legislature of Florida to delegate its law-making power to the people of Wakulla County, Florida, and/or to the people of other counties, contrary to the Constitution and laws of Florida.

"7. That it affirmatively appears by the alternative writ of mandamus that Section 12A of Chapter 17,257, Laws of Florida, 1935, is an attempt on the part of the Legislature of Florida to delegate to the people of the counties of Florida, the power to repeal or suspend a general law of Florida, all of which is unwarranted by the terms and provisions of the Constitution of Florida.

"8. That it affirmatively appears from the allegations of said alternative writ that the issuance of a peremptory writ of mandamus herein would compel these respondents to have printed on the ballots to be used in the general election the question of whether permits and licenses theretofore granted for the operation in Wakulla County, Florida, or any of the machines or devices described in Chapter 17,257, Laws of Florida, Acts of 1935, shall be continued or revoked or would compel these respondents to have the said question printed on separate ballots to be used in said General Election and would compel these respondents to provide the procedure and machinery for submitting such question at said general election at the expense of the taxpayers of Wakulla County, Florida, and would constitute an unwarranted and unauthorized expenditure of public moneys by these respondents contrary to and in contravention of the Constitution and laws of the State of Florida."

If it is the legal duty of the respondents to provide for the holding of the election in question, that duty must find its foundation and authority in Section 12A of Chapter

17,257, Acts of 1935, and so we must not look to that legislative Act. The Act has previously been before us, but the question here involved has not been presented. It occurs to us that the pertinent part of the Act to be considered is, (1st) the Title, which is as follows:

"AN ACT TO LICENSE CERTAIN TYPES OF COIN-OPERATED DEVICES: TO REGULATE THE OPERATION THEREOF; TO DESIGNATE THE PENALTIES FOR THE VIOLATION OF THIS ACT; TO DEFINE CERTAIN TYPES OF COIN-OPERATED DEVICES; PROVIDING FOR THE DIVISION AND DISTRIBUTION OF THE REVENUE DERIVED THEREFROM AND OTHER MATTERS PROPERLY RELATING THERETO; AND TO PROVIDE FOR HOLDING RECALL ELECTIONS IN ANY COUNTY TO DETERMINE WHETHER LICENSES SHALL BE REVOKED OR CONTINUED THEREIN."

Then Section 1 of the Act, which is as follows:

"It shall be unlawful for any person or persons, corporation or corporations to set up for operation, operate, lease or distribute for the purpose of operating, any coin-operated device as defined in Section Two of this Act, without first having obtained a license therefor. This Act, however, does not apply to machines or devices being displayed or demonstrated by manufacturers, distributors, salesmen and agents for sales purposes."

Sections 4, 5, 6, and 7 of the Act are as follows:

"Section 4. All licenses shall be due and payable on or before the first day of October of each year, and no license shall be issued for any fractional portion of a year, except as otherwise provided in this Act, and except that any license for a location tax may be issued after the first day of April and to expire on the 30th day of September of the same year, upon the payment of one-half of the amount fixed as the price of such license for one year.

"Section 5. The fees for such licenses to be as follows: Each 'Operator' of automatic vendors, and/or skill machines and /or trade machines, shall pay to the Tax Collector an occupational tax of One Hundred Fifty Dollars to the State and Seventy-five Dollars to the County and Seventy-five Dollars to the City or incorporated town, *and in addition thereto* the following occupational tax on each machine as set forth in this section, and each 'location operator' as defined in Section 3, shall pay an occupational license tax on *each* machine to the said Tax Collector for the State, as follows:

| | |
|---|---|
| Automatic vendors | $ 30.00 |
| Skill machines | 10.00 |
| Trade machines | 10.00 |
| Other machines | 500.00 |

and shall pay a license tax to the said Tax Collector for the County in which said machines are operated on each machine, as follows:

| | |
|---|---|
| Automatic vendors | $ 15.00 |
| Skill machines | 5.00 |
| Trade machines | 5.00 |
| Other machines | 250.00 |

and shall pay a license tax to the city or incorporated town on each machine, as follows:

| | |
|---|---|
| Automatic vendors | $ 15.00 |
| Skill machines | 5.00 |
| Trade machines | 5.00 |
| Other machines | 250.00 |

Provided, that if any 'Operator' or 'location operator' shall maintain such device or devices at any place or places so that such 'Operator' or 'location operator' is not subject to the payment of a city or town occupational license tax, then

in that event such location operator shall pay twice the amount of county license tax as herein provided.

"Section 6. The administration and enforcement of this Act shall be the duty of the Comptroller or his duly appointed Agents, and for that purpose he is hereby directed, authorized and empowered to make, promulgate and enforce such reasonable rules and regulations as he may deem necessary or expedient; to confiscate all machines as herein defined upon which all taxes herein imposed have not been paid as herein provided; to appoint and deputize a sufficient number of inspectors to properly enforce the provisions of this Act and the rules and regulations made pursuant hereto; to give instructions to and provide all forms to county tax collectors; and to do any and all acts necessary or expedient for the strict enforcement of the provisions of this Act.

"Section 7. Any and all machines licensed under this Act shall be subject to the following provisions:

"1. No person in direct charge or supervision of such machine shall knowingly permit any person under 21 years of age to engage in the play of such machines.

"2. All machines licensed by this Act must be operated and maintained at all times in an orderly manner, and the operation thereof shall be conducted with the same dignity as any other well regulated business.

"3. Provided that no automatic vending machine shall at any time be 'plugged' or changed in any manner so as to alter its ratio of premiums."

Sections 10, 11, 12A and 13 are as follows:

"Section 10. Any person, firm or corporation defined in this Act engaged in the operation of coin-controlled machines as herein defined, in violation of any of the provisions of this Act, shall be guilty of a misdemeanor and shall, upon

conviction thereof, be fined not less than One Hundred Dollars ($100.00) and not more than Two Thousand Dollars ($2,000.00), or imprisoned in the county jail not to exceed one year, or both, within the discretion of the court. And each day of operation in violation of any provision of this Act shall constitute a separate offense.

"Section 11. All money collected hereunder for the State license tax as herein provided, shall, after the expense of administering this Act, be promptly remitted, as required by law, to the Comptroller and placed in the Treasury to the credit of the General Revenue Fund."

"Section 12A. Upon petition of twenty per cent. of the qualified electors of any county the County Commissioners of such county shall provide for the submission to the electors of such county at the then next succeeding general election, the question of whether any permit or license theretofore granted for the operation of any of the machines or devices described in this Act shall be continued or revoked and if the majority of the electors voting on such question in such election shall vote to cancel or recall the licenses or permits theretofore given, then the Comptroller of the State of Florida and the Tax Collector of such county shall not thereafter grant any license for the operation of the machines and devices described in this Act. Provided, further, that any county revoking such licenses shall not thereafter participate in any of the revenues derived under this Act."

"Section 13. Saving Clause. If any section, sub-section, sentence, clause, phrase or word of this Act, is for any reason held or declared to be unconstitutional, inoperative or void, such holding or invalidity shall not affect the remaining portions of this Act; and it shall be construed to have been the legislative intent to pass this Act without

such unconstitutional, inoperative or invalid part therein; and the remainder of this Act after the exclusion of such part or parts shall be deemed and held to be valid as if such excluded parts had not been included herein; or if this Act or any provision thereof shall be held inapplicable to any person, groups of persons, property, kind of property, circumstances or set of circumstances, such holding shall not affect the applicability thereof to any other person, property or circumstance."

It is well established that a legislative Act may partake of the character of a police regulation and also of the character of a revenue measure. The Act here under consideration possessed such dual characteristics. The sections above quoted will clearly show that the Legislature realized and intended the regulation of slot machines and at the same time proposed to make the regulated operation of such machines an important source of revenue for the support of the Government. See State, *ex rel.* Baker, v. McCarthy, 12 Fla. 749, 166 So. 280, wherein we held Chapter 17257, *supra,* to be a revenue measure.

The records of the office of the Comptroller of Florida, of which this Court will take judicial cognizance, show that under the provisions of the chapter here under consideration there has been paid into the General Revenue Fund of the State of Florida up to October 1, 1936, the net sum of $329,941.94. This result is shown to be after having deducted the sum of $48,583.00 as the cost of the administration of the Act.

The record in the office of the Comptroller of Florida also shows that there are on file applications for approval of license by the Comptroller in the aggregate number of 8,098 which, when, and if, granted will bring to the General Revenue Fund of the State the additional amount of $421,-

470.00, less expense of administration. This showing is of October 9th and is, therefore, by no means to be assumed to represent the total amount of revenue to be derived from this source for the current fiscal year.

Inasmuch as the Act partakes of the character of both a police regulation and of a revenue measure to raise general revenue for the operation of the State Government, the rule of law and construction applying to measures enacted in the exercise of the police power should be adhered to, unless the application of such legal rules will violate legal principles which are applicable to revenue measures.

We have heretofore often said that this Court may take judicial cognizance of those matters which are of common knowledge and that what everybody else knows the Court will be presumed to know. It is a matter of common knowledge, and one of which we may take judicial cognizance, that although the Legislature fully realized an existing necessity for regulating the operation of slot machines in this State, the operation thereof was legalized by the Legislature primarily for the purpose of creating a new source for the production of a substantial increase in State, as well as in county and municipal, revenues, and that after all it was the revenue feature of the Bill which persuaded the House of Representatives to reverse the vote by which the same had been defeated and, upon reconsideration thereof, pass the Act.

It is contended that because Section 1 of Chapter 17,257, Acts of 1935, provides: "It shall be unlawful for any person or persons, corporation or corporations, to set up for operation, operate, lease or distribute for the purpose of operating, any coin-operated device as defined in Section Two of this Act without first having obtained a license therefor," marks this as exclusively a police regulation.

We have only to turn to the General Revenue Acts heretofore enacted by the Legislature of Florida to observe the fallacy of this argument. Section 1 of Chapter 6421, a general revenue Act of 1913, provided: "No person, firm or corporation shall engage in or manage any business, profession or occupation mentioned in this Act, unless a State license or a State and County license, or county license, as the case may be, shall have been procured from the Tax Collector of the County where the place of business may be located, or where the profession or occupation may be engaged in, or from the Comptroller or State Treasurer, as is provided by this Act," etc.

There can be no material difference in the construction of the language, "It shall be unlawful for any person," etc., and the language, "No person, firm or corporation shall engage in or manage any business," etc.

We may assume that it is very well settled that where the Legislature may authorize a vote of the electorate to determine whether or not an Act shall become, or remain, effective, it must clearly define and prescribe what the result of such vote shall be. Otherwise, we would have a delegation of power without a legislative determination of the result of the action by which the power is to be exercised.

Another well established rule is that all the taxing and licensing statutes are to be given that construction which is most favorable to the taxpayer.

Measuring Section 12A, *supra,* by these rules of construction, we must first determine what the section purports to provide and the results which it purports to authorize.

That the taxes imposed by this Act were imposed for the primary purpose of raising revenue and not as an inci-

dent to regulation is shown by the contents of the statute as written in the provision which limits the number of permits or licenses which may be issued in any county in the ratio of one permit or license to each one hundred of population. The number of permits or licenses being specifically limited, it is apparent that it was not the legislative intent to discourage the multiplicity of machines in operation by the imposition of high license tax.

Bearing in mind that the Act is a revenue measure designed to produce substantial revenue to be paid into the General Fund for the support of the State Government, as well as to provide substantial revenue for the counties and municipalities, and is also a police regulation dealing with a subject properly amenable to such regulations, and also that it is a general Act in all respects complete, and which became in full force and effect throughout the State immediately on becoming a law, which was on June 10, 1935, we find, (1st) That on petition of twenty-five per cent. of the qualified electors of any county the county commissioners of such county shall provide for the submission to the electors of such county at the next succeeding general election the question of whether *any permit or license theretofore* granted for the operation of any of the machines or devices described in this Act shall be continued or revoked. If it is not clear whether the question so to be submitted is to apply to each permit granted or to all permits granted, certainly the Act may be reasonably construed to mean that the electorate may be provided the opportunity to vote on the question as to whether any one of the many or few permits granted shall be continued or revoked. The question authorized to be submitted is whether or not *any* permit or license theretofore granted shall be revoked. Does "theretofore" apply to the date of the election or to the date of

the filing of the petition? This it is not needful for us to answer. The manner of submission is not designated.

(2nd) It is provided that if the majority of the electors voting on such question in such election shall vote to cancel or recall the *licenses or permits theretofore given,* then the Comptroller of State of Florida and the Tax Collector of such county shall not thereafter grant any license for the operation of the machines and devices described in this Act. The Act does not provide that upon the majority of the electors voting in such election to cancel or recall the licenses or permits theretofore granted that the same shall therupon stand cancelled or that the holders of such licenses or permits shall thereafter be prohibited from continuing to operate such machine or devices under such licenses or permits, but the Act in terms limits the effect of such result of such election to withdrawing from the Comptroller and Tax Collector the authority to thereafter issue any license for the operation of such machines or devices in that county.

The result is that if this section of the Act is valid the electors of any particular county may by vote suspend the operation of a revenue measure in that county at the expiration of the current license period and thereby withdraw from the State a substantial portion of its source of revenue.

And so it is, if Section 12A, *supra,* is valid and an election is held in Wakulla County pursuant thereto and that election results in a majority of the electors voting to cancel and recall all permits theretofore issued, such result will not cancel or recall such permits or licenses. It will leave them in full force and effect, but will suspend the power of the Comptroller and Tax Collector to issue further permits or licenses in that county and from collecting further reve-

nues from this source in that county and will therefore make it unlawful to operate the class of machines or devices in that county after the expiration of the period covered by the licenses theretofore issued.

The third provision of this section to the effect that counties in which the operation of the Act shall be suspended by the vote of electors shall not thereafter participate in the revenues derived from the administrtion of the Act can have no force or effect. This is true because if no county tax is collected there will be none of that for the county. But the State tax goes into the General Fund for the operation of State Government, and other purposes for which same is appropriated, particularly for the operation of public schools, and there is no way to eliminate the benefits thereof from any county in favor of other counties. So, those counties suspending the operation of the Act would continue to participate in the benefits derived by counties from the General Revenue of the State augmented by this source of revenue to which such counties would not contribute, just as if they had not so acted.

Unquestionably the Act is a regulatory Act warranted by the lawful exercise of the police power, and is also a State, County and Municipal measure. We hold that the revenue feature predominates.

It is an Act licensing and placing a license tax on the operation of certain nefarious gambling devices exercising a harmful and demoralizing influence on members of the public who patronize them. It is designed to, and the records show it will produce revenue to the State, Counties and Municipalities probably more than One Million Dollars annually.

There are imposed four non-burdensome items of regulation:

First. There must be maintained in each county a ratio of not more than one machine to each one hundred persons in population.

Second. The machine must not be played by minors.

Third. The machine must not be located within a stated distance of a church or school.

Fourth. It must be operated at the place designated in the license by the person or persons named therein.

No burdensome regulation is imposed.

The revenue for the current year which will accrue from the administration of the Act to the State, County and Municipalities, as is shown by the records of the office of the State Comptroller, will substantially *exceed* One Million Dollars.

We must hold that a legislative Act designed to produce from one small branch of one class of business more than a Million Dollars a year, one-half of which, less small cost of administration, goes into the State's General Revenue Fund and is appropriated along with other items of that fund, is a revenue measure, although the Act does contain some police regulations.

The operating of many of the machines and devices which are licensed and legalized by the Act under consideration was prior to the passage of the Act prohibited by the laws of this State denouncing gambling and operating gambling houses. The Act abolished the prohibition and, to procure the coveted revenue, substituted most liberal regulations. The revenue feature is the only feature of the Act which can be pointed to as remotely justifying its passage and existence.

Former opinions and judgments of this Court definitely commit us to the rule that some legislative Acts complete

in themselves may become operative only on the happening of a named condition and that such condition may be the affirmative vote of the electors in designated area (See Bailey v. Van Pelt, 78 Fla. 337, 82 Sou. 789, and other cases referred to in this opinion) and we will cast our lot with what may be the minority, but we think the more logical view and hold that in those classes of cases where the legislative Act may become operative on the happening of a stated condition, which condition may be the affirmative vote of the electorate, it is also competent for the Legislature to provide that such an Act shall become inoperative in a designated area upon the happening of a certain contingency, and that contingency may be the designated vote of electors in the area affected. But this rule will not apply to measures primarily designed to produce the revenue necessary to support the government.

The opinion and judgment in the case of State, *ex rel.* Mira, v. Smith, 26 Fla. 427, 7 Sou. 848, was based on the provisions of Article XIX of the Constitution which specifically provided for referendum elections to effectuate local option in regard to the sale of intoxicating liquor and, therefore, can in nowise be construed to support the contention of relator.

In the case of Bailey v. Van Pelt, 78 Fla. 337, 82 Sou. 789, the Court dealt with a statute which was exclusively a regulatory statute enacted in the exercise of the police power. That statute provided that the provisions thereof should not become effective in any county unless and until a majority of the qualified electors in such county had voted in favor of its enforcement in such county. In that case the Court dealt with a statute which was not designed to produce revenue for the support of the State Government,

but was designed to promote the general welfare of the localities in which it should become operative.

It, therefore, appears that the enunciations promulgated in that opinion have no bearing on the case in hand.

The same observation applies to the case of Whitaker v. Parsons, 80 Fla. 352, 86 Sou. 247.

In Cotton v. County Commissioners of Leon County, 6 Fla. 610, the Court construed provisions of the Internal Improvement Act of 1885, Section 22 of which was, in part, as follows:

"Sec. 22. *Be it further enacted,* That it shall be lawful for the Board of County Commissioners of any county or the Mayor and Council of any city, or the Trustees of any Town through or near which such Railroad or their extensions may pass or in which they may terminate, and they are hereby authorized to subscribe and hold stock in said company, upon the same terms and conditions, and subject to the same restrictions as other stockholders; *Provided,* it shall be first submitted to the vote of the legal voters of said county, city, or town, to be held and taken at such times and places, and in such a manner as said authorities respectively may appoint, whether or not stock shall be taken; and if when the vote be thus taken it shall appear that a majority of the votes shall be in favor of such subscription, it shall thereupon be lawful for the board of county commissioners, city or town authorities, by agents by them appointed, to subscribe and take in such company such an amount of stock as they shall determine."

In the learned and exhaustive opinion prepared for the Court by Mr. Justice DuPont, it is said:

"Another objection urged against the validity of the act of subscription to the stock of the railroad company, and

one that at the first blush is rather imposing and plausible, is, that by the terms of the statute its operating vitality was made to depend wholly upon the votes of the people. The position assumed in the argument was, that this act of submission amounted in fact to a virtual delegation of the taxing power to the people, and therefore a clear violation of those clauses of the Constitution which confines the exercise of that power to the General Assembly, and by their permission to the respective county authorities. If the view taken of this subject by the appellants were correct, and it be true that the Act in question does (not) delegate the people the authority to make subscription and the consequent power to levy taxes to pay for the same, we have no hesitancy in declaring such an Act of the Legislature to be a palpable infraction of the Constitution, and one that would demand the prompt interposition of the judiciary. It would clearly be changing the essential character of our political institutions by converting a representative government into a pure democracy. But such is not the view which we have taken of the provision in that Act. We can discover nothing in it which bears even a semblance to a delegation of legislative power. The only operation of that provision is to obtain, in a perfectly legitimate mode, the expression of the will of the constituent as a guide for the action of the representative."

Here that great jurist condemned an Act delegating the taxing power to the people to be a "Palpable infraction of the Constitution" and he said, in effect, that such legislative action "would clearly be changing the essential character of our political institutions by converting a representative government into a pure democracy."

In the case of State, *ex rel.* Cheyney, v. Sammons, 62 Fla. 303, 57 Sou. 196, the Court had under consideration an

Act designed to create Pinellas County and in the opinion by Mr. Chief Justice W<span style="font-variant:small-caps">HITFIELD</span> it was said:

"The title of the Act indicates a purpose to provide for the creation of a new county and also for the organization and government thereof. The statute is complete in itself and it is expressly provided that the first nineteen sections thereof shall take effect upon the contingency of an affirmative vote of three-fourths of the votes cast at an election to be held under the last two sections of the Act in the territory set forth in the Act as the County of Pinellas.

"When the requisite vote was cast it afforded the contingency upon which the Act by its terms became effective. Upon thus taking effect the County of Pinellas was thereby established. The organization and government of the county depended upon the operation of the sections of the Act designed for that purpose. Such organization and government are political matters to be made effective by the executive department in the manner and by the means prescribed in the Act. In providing that the Act shall become effective upon the casting of the requisite vote and that the Governor shall on or before December 15th, 1911, appoint all the officers to which said county may be entitled under the Constitution and laws of the State, the clear legislative intent is that the county shall be established upon the happening of the contingency of the affirmative vote stated, and that within the time stated in the Act the organization and government of the county shall be effected upon executive appointment and qualification of the chief administrative officers having jurisdiction over the entire territory embraced in the new county."

So it is that the opinion in that case is not pertinent to the condition now before us.

In the case of Olds v. State, *ex rel.,* 101 Fla. 218, 133 Sou. 641, the Court was dealing with a legislative Act coming within the purview of Section 8, Article VIII, of the Constitution, but even there we only held that:

"The Legislature may make a law complete in itself to take effect by its own terms upon the happening of a contingency of a stated affirmative vote at an election therein provided for."

In *Ex Parte* Lewis, 101 Fla. 624, 135 Sou. 147, we held:

"The Legislature may not delegate the power to enact a law or to declare what the law shall be, or to exercise an unrestricted discretion in applying the law; but it may enact a law complete in itself designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. The true distinction is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under, and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

If the Legislature may not delegate the power to enact a law, surely it cannot delegate the power to repeal the law, in whole or in part.

In State, *ex rel.* Davis, v. City of Homestead, 100 Fla. 354, 100 Fla. 361, 130 Sou. 28, in the first opinion we held:

"The provision of Chapter 6940, Acts 1915, that 'this Act shall not be so construed as to authorize any city or town to enlarge its corporate powers beyond the limitations prescribed by law, except that it may extend its territorial boundaries as provided by law, does not expressly or by in-

tendment authorize a municipality to extend its territorial limits that have been defined by statute, though such provision does recognize the statutory authority of a municipality that is organized under the general law to enlarge its boundaries as prescribed by the statute as it likewise recognizes the power of the Legislature under the Constitution to change by statute the boundaries of any municipality."

And, on rehearing, we held.

"Section 3051, Comp. Gen. Laws 1927, cannot be invoked to enlarge municipal boundaries that have been specifically defined by statute, because having been enacted in 1879 under the Constitution of 1868, its language is applicable to municipalities organized under the general law, and the terms used are not applicable to municipalities whose boundaries have been specifically fixed by statute.

"If a statute may provide that municipal boundaries, though fixed by statute, may be enlarged by the operation of the statute upon local or other action taken for such extension (See City of Jacksonville v. Bowden, 67 Fla. 181, 64 So. R. 769), Section 3051, Comp. Gen. Laws, 1927, does not so operate."

In the case of Beasley v. Cahoon, 109 Fla. 106, 147 Sou. 288, we upheld the classification feature of an Act to license and regulate the business of making loans in which Act population was made the basis of classification, saying:

"As shown by its preamble, set out in the statement hereto, the enactment is designed to remedy an existing evil, which the Legislature conceivably and reasonably could, and apparently did, determine was more pronounced and harmful in the more populous counties of the State. The law-making power may under its police power, as was done in this case, enact regulations that are not all-embracing; and may classify regulatory enactments with reference to

degrees of evil and to the location where the evil is most harmful, without denying the equal protection of the laws. If the greatest of the evils sought to be remédied exist in the counties having relatively large populations, statutes may determine the lines of differentiation without denying to any person the equal protection of the laws. No one can justly or legally demand all the rights of exceptions enjoyed by others if there is a reasonable basis for the discrimination complained of; and those who assert an unjust discrimination by the State in violation of the Federal Constitution have the burden of showing that the asserted discrimination has no conceivable basis in differences of conditions, sufficient to justify the statutory regulation complained of. No such showing is made in this case. The opportunities in the larger counties for the abuses sought to be remedied by this statute afford a sufficient basis for a classification on a 40,000 population unit."

The law was upheld on the theory that its discrimination had a justifiable basis of classification.

In the case of Hiers v. Mitchell, 95 Fla. 345, 116 Sou. 81, we held:

"In imposing license or occupational taxes, the only limitations upon a duly enacted statute are that no person shall be deprived of property without due process of law or denied the equal protection of the laws. The levy of an *ad valorem* tax upon property and also a license or occupational tax upon the use of the same property is not double taxation. A license fee is not a tax within the meaning of the provisions of the organic law requiring uniformity of rates and just valuations of property for purposes of taxation.

"The Act here under consideration is not a local Act,

but is general legislation affecting all persons engaged in the business to which it applies and who are like situated.

"The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality."

*Non constat* a classification which has no reasonable basis is inoperative.

So where it is proposed to allow any county to determine for itself whether or not a general revenue statute shall be operative in that county affords no reasonable basis for classification.

Mr. Cooley, in his work on Constitutional Limitations, page 242, Vol. 1, 8th Ed., says:

"The same reasons which preclude the original enactment of a law from being referred to the people would render it equally incompetent to refer to their decision the question whether an existing law should be repealed. If the one is 'a plain surrender to the people of the law-making power' so also is the other.

Then the author cites as authority for this proposition the cases of Geebrick v. State, 5 Iowa 491; Rice v. Foster, 4 Barr. 479; Parker v. Commonwealth, 6 Pa. St. 507. The case in 5 Iowa was followed in State v. Weir, 33 Iowa 134, 11 Am. Rep. 115.

In the case of Geebrick v. State, *supra,* an Act of 1855 of general character was in force throughout the State of Iowa totally prohibiting the manufacture or sale of intoxi-

cating liquors. An Act of general character was passed in 1857, providing for the issuance of license to sell intoxicating liquors to any persons making application according to its provisions. By the 17th and 18th sections of the latter Act it is provided that the Act of 1855 is not repealed in any county of the State, unless the people of such county shall, by vote taken upon the question of licensing the sale of intoxicating liquors, adopt the Act of 1857; and if the majority of the legal voters in any county shall vote in favor of the Act, then the county judge shall proceed to issue license as provided therein. The Court held the Act of 1857 unconstitutional. The Court said in this case:

"We cannot be mistaken in interpreting this Act, and the proceedings authorized by it, to be in effect, the repeal of one law, and the enactment of another, by a vote of the people. The question does not differ essentially, from that decided in *Rice v. Foster, supra,* in which it is held that a reference to the decision of the people at the polls, of the question whether license shall be granted or not, and according to their decision in any county, continuing or repealing therein the former law, and substituting the new one in its place, is a plain surrender to the people of the lawmaking power. A law can no more be repealed, than it can be made, by the vote of the people, and the fact of a majority of the votes being cast in favor of license, can have no more effect in repealing the prohibitory liquor law, than it can have in authorizing the county judge to issue license."

The Court said further in the opinion:

"The vote authorized to be taken upon the adoption of the Act, while it is objectionable in a constitutional point of view, as transferring the law-making power from the Legislature to the people, is further objectionable in view of the possible, not to say the probable, result of such vote.

We cannot undertake to determine, nor can it, under any circumstances, be foreseen that the result of the vote will be uniform in all the counties of the State, either in favor of license or against it. In some of the counties the vote may not be taken; in others the majority may be against license; while in others the majority may be in its favor. Unanimity of sentiment, either one way or the other, can hardly be reckoned upon. These views, we think, add weight to the argument against the constitutionality of submitting the Act to a vote of the people. We do not, however, base wholly upon them our conclusion against the validity of the Act in question, nor upon the fact that the result of the vote upon the question of adopting it may not be uniform throughout the State. Upon this latter branch of the subject, the members of the Court are not unanimous in opinion.

"The majority of the Court, however, are of the opinion that while the Act must, without doubt, be deemed to be a law of general nature, it is liable to objection, as prescribing no uniform rule of civil conduct to the people of the State, and as not providing of itself, for its uniform operation. The legislative power must command. It must not leave to the people the choice to' obey, or not to obey, its requirements. It is not a law enacted according to the requirements of the Constitution, if there is left to the action and choice of the people upon whom it is to operate, the determination of a question which may result in a want of uniformity in the operation of a law of a general nature."

In the case of Parker v. Commonwealth, 5 Pa. St. 507, the Pennsylvania Court held an Act of 1846 invalid. Various, kinds of licensing Acts were enacted in Pennsylvania until the Act of 1834, which supplemented and repealed previous enactments on the same subject and empowered

Courts of Quarter Sessions and Mayor's Courts to grant licenses to taverns or inns to sell liquors to persons applying for the same under certain regulations and restrictions. An Act of 1841 provided for punishment for those selling without a license. The Act of 1846 provided that the citizens of the several boroughs, wards and townships, in certain counties named, including the County of Allegheny, at the annual election of constables or other township officers shall decide by their vote whether sale of liquors should be permitted among them for the ensuing year, and that whenever a borough, ward or township voted against the sale of liquors, no license could be issued to any inn or tavern keeper within that locality for the ensuing year. The Court in part of its opinion said:

"If a majority of votes be cast in the affirmative, then the Act is to take effect as a statute, establishing a new rule and repealing the old. It operates not *propria vigore,* but, if at all, only by virtue of a mandate expressed subsequently to its enactment, in pursuance of an invitation given by the legislative bodies. As it left the halls of legislation, it was imperfect and unfinished; for it lacked the qualities of command and prohibition absolutely essential to every law. We have seen there can be no such thing as a law, unless it be mandatory and obligatory upon those who are to be the subjects of it, by a declaration of the legislative will. From whence does the Act of 1846 derive its mandatory and obligatory character? Not from the Legislature, for in the day of its enactment it possessed it not. If it has that character at all, it must have been conferred by the *fiat* of a portion of the people expressed through their votes. But the popular decree can only have worked this effect, because the citizens voting were, in some way, clothed with the power of ordinary legislation. Now it

cannot be pretended they possessed this power, unless they drew it from the invitation to declare their will by an exercise of the elective franchise. If so, what is this other than a delegation of the legislative franchise by an Act of the General Assembly? But, as has been shown, this body was altogether incompetent to make such a transfer." (P. 518.)

The following is taken from a note in 11 Am. Rep. 117:

"The Supreme Court of New Jersey, in State v. Morris, *Common Pleas,* 12 Am. L: Reg. (N. S.) 32, decided that a 'local option law' prohibiting the sale of intoxicating liquors without license, and providing that whether or not licenses shall be granted in any township, shall be dependent upon the vote of the township, was constitutional, and that the people or municipal corporations may lawfully be invested with authority to regulate or prohibit the retailing of intoxicating drinks. The Court said:

" 'It must be conceded that this law can have no sanction if it is a delegation of the law-making power to the people of the township. If the right to declare what the law shall be in one case may be referred to the people, the right to do so may be given in all cases, and thus the Legislature may divest itself wholly of the power lodged in it by the fundamental law, until by subsequent legislation, it shall be resumed. It is also obvious that it is not competent to delegate to the people the right to say whether an existing law shall be repealed or its operation suspended. To say that what is now the law shall not hereafter, or shall not for a specified time be the law, is in effect to declare the law to be otherwise than it now is, and is a clear exercise of the law-making power. The will of the Legislature must be expressed in the form of a law by their own act. If it is left to the contingency of a popular vote to pronounce

whether it shall take effect it is not the will of the law-makers, but the voice of their constituents, which molds the rule of action. If the vote is affirmative, it is law; if in the negative it is not law; the vote makes or defeats the law, and thus the people are permitted unlawfully to resume the right of which they have divested themselves by a written Constitution, to declare, by their own direct action, what shall be law. The cases upon this subject, so far as they assert the principle above stated, have my entire concurrence. Parker v. Commonwealth, 6 Barr. 507; Rice v Foster, 4 Harrington 479; Maize v. State, 4 Ind. 342; State v. Parker, 26 Vt. 357; Santo v. State, 2 Iowa 168; Patterson v. Society, etc., 4 Zabr. 385.'

"But the Court regarded the Act in that case as a delegation of the power to make police regulations and not a delegation of the legislative power, and held it to be constitutional. See, to the same effect, *Com.* v. *Bennett*, 108 Mass. 27."

In Vol. 1, Cooley on Taxation (4th Ed.) 75, Sec. 12, revenue laws are defined as follows:

" 'Revenue' is a broader term than 'taxes.' While under the Federal Government the term most usually applied to the laws by which taxes are laid and collected is revenue laws, in a number of the states that term is seldom made use of as applying to the laws of the State for the corresponding purpose. There is no substantial difference, however, in the meaning of the two terms, tax laws and revenue laws. 'Any law,' it is said, 'which provides for the assessment and collection of a tax to defray the expenses of the government is a revenue law. Such legislation is commonly referred to under the general term 'revenue measures' and those measures include all the laws by which the government provides means for meeting its expenditures.' How-

ever, revenue laws include only those whose principal object is the raising of revenue, and not those under which revenue may incidentally arise. Moreover, a mere appropriation of public money, although it may lead to the necessity of taxation, is not a revenue law.

"The importance of determining whether an Act is a revenue law usually is connected with the question as to the necessity of revenue laws originating in the lower House of the Federal or State Legislature, the question as to jurisdiction of particular courts, or the question as to the right to appeal."

In Vol. 4, Cooley on Taxation (4th Ed.) 3516, Sec. 1786, the following is found:

"AMOUNT OF IMPOSITION AS INDICATING WHETHER INTENDED FOR REGULATION OR FOR REVENUE. The amount of the fee or charge is properly considered in determining whether it is a tax or an exercise of the police power. The amount may be so large as to itself show that the purpose was to raise revenue and not to regulate; but in regard to this matter there is a marked distinction between license fees imposed upon useful and beneficial occupations which the sovereign wishes to regulate, but not restrict, and those which are inimical and dangerous to public health, morals, or safety. In the latter case the fee may be very large without necessarily being a tax."

The following is found in 4th Ed. Cooley on Taxation, 3511, Sec. 1784:

"The distinction of a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different. The one is made for regulation and the other for revenue. If the purpose is regulation the imposition

ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. However, regulation may be kept in view when revenue is the main and primary purpose. The right of any sovereignty to look beyond the immediate purpose to the general effect neither is, nor can be, disputed. The government has general authority to raise a revenue and to choose the methods of doing so; it has also general authority over the regulation of relative rights, privileges and duties, and there is no rule of reason or policy in government which can require the Legislature, when making laws with the one object in view to exclude carefully from its attention the other. Nevertheless cases of this nature are to be regarded as cases of taxation. Revenue is the primary purpose, and the regulation results from the methods of apportionment that are resorted to in obtaining the revenue. Only those cases where regulation is the primary purpose can be specially referred to the police power. If revenue is the primary purpose and regulation is merely incidental the imposition is a tax; while if regulation is the primary purpose the mere fact that incidentally a revenue is also obtained does not make the imposition a tax, *although if the imposition clearly and materially exceeds the cost of regulation, inspection or police control, it is generally held to be a tax or an illegal exercise of the police power, except as hereinafter noted."* (Emphasis supplied.)

If we should hold that the provisions of Section 12A, *supra,* may be invoked to repeal the application of the legislative Act in which it appears in Wakulla County we must thereby say that the Legislature may pass a valid Act author-

izing any county in the State to hold an election and thereby determine whether or not the provisions of Chapter 14,491, Acts of Extraordinary Session of 1929, shall continue in force in that county and may provide that any county may likewise so determine whether or not the provisions of Chapter 16,848, Acts of 1935, which is both a police and a revenue measure, shall continue operative in such county.

Thus could the counties, one by one, deprive the State of its every source of revenue.

The operation of initiative and referendum is not provided by your Constitution and, therefore, the law-making or law-repealing power is not vested in the people.

The right of the Board of County Commissioners to contest the validity of the statute here involved is on the theory that compliance with it involves the expenditure of public funds. Such right is recognized and approved in the case of Crawford v. Gilchrist, 64 Fla. 41, 59 Sou. 963.

ELLIS, P. J., concurs.